No. 55.—QUINTILIAN SKRINE, administrator, &c. plaintiff in error, *vs.* JOSEPH T. SIMMONS and Wife, and others, defendants in error.

[1.] Where an executor or administrator *collusively* sells the goods of his testator or intestate, at an *under value*, when he might have obtained a higher price for them, it is a *devastavit*, and he shall answer the *real value;* notwithstanding the object was accomplished under the *form* of a judicial sale by the Sheriff, under an execution obtained against the administrator in his representative capacity.

[2.] A Court of Equity will look into the whole transaction, consider the relative position and duties of the parties, and if it shall satisfactorily appear that the property of the defendant's intestate has been sold at an *under value* by his *collusion* with the plaintiff in execution, and his *active* interference on the day of sale to produce that result, he will not be permitted to shelter himself from a full discovery, under the *mere form of a judicial sale.*

[3.] It is not necessary to allege the commission of fraud *in totidem verbis.* If the bill states with distinctness and precision, facts and circumstances, which in themselves amount to a fraud, it is quite as unobjectionable as if the very term itself was employed.

Skrine *vs.* Simmons and others.

[4.] Fraud and damage, coupled together, will entitle the injured party to relief in any Court of Justice.

In Equity, in Burke Superior Court. Decision on demurrer, by Judge H. R. JACKSON, May 5th, 1852.

William A. Skrine, of Washington County, died intestate, and Quintilian Skrine became the administrator. Joseph T. Simmons and wife, and others, the distributees of Wm. A. Skrine, in 1851, filed their bill in Equity, in Washington Superior Court.

The bill charged, in December, 1837, or January, 1838, a valuable tract of land belonging to the estate, and known as the "Mount Ariel" plantation, was levied on by the Sheriff of said County, by virtue of a *fi. fa.* in favor of V. V. Skrine, against the said Quintilian, as administrator; that in February, 1838, the Sheriff sold the land without any notification that specie would be required, and Thomas J. Warthen became the purchaser, at the sum of $5,500; that Quintilian Skrine was there present, and bidding, his last bid being $5000; that after the sale, said administrator announced publicly, that specie was required, and if not promptly paid, the land would be re-sold; that the Sheriff then required specie of Warthen, who being unprepared, proposed to comply in ten days; that the land was then re-sold immediately, at Warthen's risk, the Sheriff reading a written notice signed by V. V. Skrine, (but in the handwriting of the administrator,) demanding specie or specie-paying bank bills; that Robert W. Flournoy then became the purchaser at the sum of $5,500; that Flournoy being unprepared to pay the specie, proposed to do so in ten days, (being a man in affluent circumstances,) and to hypothecate bank stock, or any other security, for the payment of the money within that time; that the Sheriff, under the instigation of the said administrator, through V. V. Skrine, refused to comply with the offer, and again offered the land for sale, when the land was bid off nominally by V. V. Skrine, at the sum of $3000, but really for the joint benefit of the said V. V. Skrine and the said administrator, as was evidenced by written articles of agreement between them, attached as an exhibit to the bill. The prayer was, that the administrator might be made

to account for $2,500, with interest from the time of the sale, that being the difference between his bid and the former bids.

To this bill a demurrer was filed, on several grounds, reducable to one: That the facts charged in reference to the sale of the Mount Ariel plantation, did not render the administrator liable to account as required by the bill; he having done nothing in relation thereto, which he had not in law, the right to do.

Judge *H. R. Jackson*, to whom this demurrer was submitted, overruled the demurrer, and this decision is assigned as error.

A. J. MILLER, for the plaintiff in error, submitted the following points:

1st. The sales having been made by the Sheriff, were beyond the control of the administrator, who, therefore, is not liable for what occurred.

2d. The acts of the Sheriff were legal, and if not, he is responsible, not the administrator.

3d. A plaintiff in execution has a right to require specie of a purchaser, though no notice of the requirement be given before the sale.

4th. An administrator, as an individual, has the right to purchase for himself the property of the intestate, when sold by a Sheriff.

5th. The first and second purchasers were liable upon their bid, especially the second, for the difference between his bid and that of the last purchaser.

6th. Such liability could have been enforced by any party interested. *Cobb's Dig.* 513, 514. *5 Ga. R.* 400.

7th. The administrator, as an individual, had good right to do what is charged in the bill; therefore, he has committed no fraud. Fraud is not charged. *5 Ga. R.* 403.

8th. Admitting that the sale might have been set aside upon the proper suit of the heirs at law, that was the only burden under which the purchaser took the property. *8 Ga. R.* 236.

C. J. JENKINS, for defendant in error.

Skrine *vs.* Simmons and others.

*By the Court.*—WARNER, J. delivering the opinion.

This bill is filed by the heirs and legal distributees of William A. Skrine, deceased, against Quintilian Skrine, administrator of Wm. A. Skrine, calling upon him to account to them for the sum of twenty-five hundred dollars, which, they allege, they are entitled to recover, by reason of his *breach of duty* as such administrator, in the sale of the " Mount Ariel " plantation, the property of his intestate.

The facts charged in the bill of the complainants, upon which their equitable title to relief is predicated, are in substance : that in the early part of the year of 1838, a valuable plantation, the property of the intestate, in the hands of the defendant to be administered, known as the " Mount Ariel " plantation, in Washington County, containing about one thousand acres, was levied on by the Sheriff of the County of Washington, to satisfy a *fi. fa.* obtained against the defendant, as the administrator of the intestate, in favor of Virgil V. Skrine, the brother of the defendant ; that on the first Tuesday in February, 1838, the plantation was offered for sale by the Sheriff to the highest bidder, without any special notice being given that specie, or the bills of specie-paying banks, would be required in payment. The plantation was bid off by Thomas J. Warthen, for the sum of five thousand five hundred dollars, the defendant being present, and bidding for the plantation the sum of five thousand dollars, the next highest bidder to Warthen. After the plantation was knocked off by the Sheriff to Warthen, as the highest and best bidder, *the defendant* publicly announced, that specie was required of the purchaser in payment, and if not promptly paid, said plantation would be re-sold at the risk of the purchaser. Warthen, the purchaser, declared, he was not then prepared to comply with the requisitions made upon him, but would do so within ten days, if that time should be allowed him ; but the said plantation was forthwith offered for sale by the Sheriff, on the same day, by *the directions of the defendant*, at the risk of Warthen. When the plantation was offered for sale the second time, a written notice was handed to the Sheriff by Virgil V. Skrine, the

plaintiff in *fi. fa.* but drawn up in *the handwriting of the defendant*, to the effect that specie, or the bills of specie-paying banks, would be required in payment. At the second sale, the principal bidders were *the defendant* and one Robert W. Flournoy, and the plantation was knocked off to the latter, as the highest and best bidder, by the Sheriff, for the sum of five thousand five hundred dollars, who was well known to the defendant to be in affluent circumstances, with ample pecuniary resources, and prompt in meeting his engagements. On payment being demanded of Flournoy, he responded, that he could not immediately comply with the terms of the sale, but offered to do so within ten days, or a shorter time, and forthwith offered to hypothecate scrip for bank stock, as security for such payment within the specified time; but the Sheriff, by the *direction of the defendant*, or the said Virgil V. at the *instigation and prompting of the defendant*, declined said offer *immediately*, and on the same day, offered the plantation for sale the third time. The complainants allege, that the bidders being discouraged by the circumstances before narrated, there was little if any competition, and the Sheriff, upon *the bid of the defendant*, in the name of the said Virgil V. Skrine, but in truth and in fact, upon the *joint account*, and for the *mutual benefit of them, the said Virgil V. and the defendant*, declared said plantation sold to the said Virgil V. for the sum of three thousand dollars, being twenty-five hundred dollars less than the sum offered at each of the preceding sales, whereby, the last mentioned sum of money, as the complainants allege, was lost to them, as the distributees of the intestate's estate.

The complainants also expressly charge in their bill, that the defendant was the *principal actor* in the sale of the plantation, as before stated, and that the said Virgil V. so far as he participated in the sale thereof, acted upon the *suggestions*, and by the *advice of the defendant*; that although the said Virgil V. was the *nominal* purchaser of the property, *the defendant was the bidder*, and was by a *previous* understanding and agreement between them, *equally interested with said Virgil V. in the purchase.* The complainants further allege in their bill, that within ten days af-

ter the sale of the plantation, *the defendant* drew up certain articles of agreement between himself and the said Virgil V. *affirming their joint and equal interest in the property,* and providing for their *joint management* and *enjoyment thereof,* a copy of which is attached to the complainants' bill as an exhibit; also a note signed by the defendant, in which the *copartnership* in the " Mount Ariel property " is mentioned. The articles of agreement alleged to have been drawn up by the defendant in regard to the " Mount Ariel " plantation, and providing for the mutual enjoyment thereof, between himself and the said Virgil V. recites, that it was sold under the *fi. fa.* for the sum of three thousand dollars, and bid off by the latter. In the second article of the alleged agreement, it is stipulated, that the premises shall be held in the name of the said Virgil V. by deed from the Sheriff, but that Virgil V. shall, at any time thereafter, upon the *request of the defendant,* make him such an assurance by deed, or otherwise, as shall vest in him legal and equitable titles, as tenant in common of the whole of said estate, known as the " Mount Ariel" place.

These articles of agreement were not signed by either party, but it is alleged by the complainants, that the same were drawn up *by the defendant,* and submitted by him to Virgil V. Skrine, to be executed by him. We have thus carefully referred to the main allegations contained in the complainants' bill, in order that the legal points involved in it, may be understood.

To this bill, the defendant filed a demurrer, and insists, *First,* that the sale of the property having been made by the Sheriff, was beyond the control of the administrator, who is not, therefore, liable for what occurred.

*Second.* The acts of the Sheriff were legal, and if not, he is responsible, and not the administrator.

*Third.* A plaintiff in execution has a right to require specie of a purchaser, though no notice of the requirement be given before the sale.

*Fourth.* An administrator, as an individual, has the right to purchase for himself, the property of the intestate, when sold by a Sheriff.

*Fifth.* The first and second purchasers, are liable upon their bids, especially the second, for the difference between the bid, and that of the last purchaser, and such liability could have been enforced by any party interested.

*Sixth.* The administrator, as an individual, had good right to do what is charged in the bill; therefore, he has committed no fraud—and fraud is not charged.

*Seventh.* Admitting that the sale might have been set aside upon the proper suit of the heirs at law, that was the only burden under which the purchaser took the property.

This bill, it will be observed, is not filed to *set aside the sale of the land,* nor to make the *purchasers* at the Sheriff's sale liable for the loss sustained by the complainants, in the sale of the " Mount Ariel " plantation. The complainants do not now seek to disturb the sale of the land, or to make the bidders at the Sheriff's sale, liable for the difference in price, between the first, second, and last sale. The complainants now seek to make the defendant liable, *as the administrator of the intestate,* for the loss which they have sustained, on account of his *breach of duty* as such administrator, in the sale of the " Mount Ariel " plantation ; and this view of the case, disposes of the fifth and seventh grounds of objection urged by the defendant.

The main question presented by the record for our consideration and judgment is, whether the defendant as administrator, is liable to account to the complainants for the alleged loss in the sale of the " Mount Ariel " plantation ?

[1.] Where an executor, or administrator, *collusively* sells the goods of his testator, or intestate, at an *under value,* when he might have obtained a higher price for them, it is a *devastavit,* and he shall answer the *real value.* 2 *Williams on Ex'trs,* 1105. 1 *Comyn's Dig.* top page, 487. *Administration, letter I,* 1. 4 *Bacon's Ab.* 100. *Executors and Administrators, letter L.* 1. Lord *Redesdale* said, in *Adair vs. Shaw,* (1 *Schoales & Lefroy,* 243,) " It has been the constant habit of Courts of Equity, to charge persons in the character of *trustees* with the consequences of a *breach of trust ;* and to charge their representatives also, whether they derive benefit from the breach of trust, or not."

Lord *Thurlow*, in *Scott vs. Tyler*, (2 *Dickens' R.* 725,) held, that "fraud and covin will vitiate any transaction, and turn it to a *mere color ;* if, therefore, a man concerts with an executor by obtaining the testator's effects at a nominal price, or at a *fraudulent undervalue,* or by applying the real value to the purchase of other subjects for his own behoof, *or in any other manner,* contrary to the duty of the office of executor, such concert will involve the seeming purchaser, and make him liable to the *full value.*"

[2.] Now let us examine the facts connected with the sale of the "Mount Ariel" plantation, as disclosed by the record before us, that we may determine whether the defendant, as administrator, is justly chargeable with a *breach of duty* which will make him liable to the complainants, in a Court of Equity, according to the general principles established by the authorities which we have cited. The defendant says he is not liable, because the sale was a *judicial* sale, made by the Sheriff, under execution obtained against him in his representative capacity ; that the plaintiff in the execution had the *legal right* to require specie in payment, and that he, as an individual, had the *legal right* to purchase the property at the Sheriff's sale. Had the defendant remained *passive,* and taken no *active* part in the transaction, for the purpose of causing the property of his intestate to be sold at a *reduced price,* at the Sheriff's sale, we should not be disposed to controvert the *abstract* propositions of the defendant, although we should have watched with *scrupulous jealousy,* such a purchase made by the administrator, whose duty it was to see, that the property of his intestate was brought to sale to the best *advantage,* under the circumstances, so far as it was in his power to control them. The first question that presents itself is, did the property sell for its *full value* at the Sheriff's sale, or was it sold at an *under value ?* If we take Flournoy's bid as the criterion of its value, it sold for twenty-five hundred dollars less than its *specie* value. If we take the two bids of the defendant, as the criterion of its *specie* value, the plantation was sold for two thousand dollars *less than its actual value;* for at the two first sales, he bid *five thousand dollars* for it, and finally it was bid off

by Virgil V. Skrine, the plaintiff in the execution, for *three thousand dollars*, at the third and last sale. The fact, that the plantation of the intestate was sold at an *under value*, constitutes one of the *prominent features* on the face of the record before us. Was the defendant *interested* in the purchase of the plantation bid off by his brother, the plaintiff in execution, at such an *under value*, and did he *actively* contribute to produce that result, on the day of sale? When the land was bid off by Warthen, at the first sale, *the defendant* publicly announced, that *specie* was required of the purchaser ; although no notice to that effect had been previously given by the plaintiff in execution, who appears to have been present at the sale. When Warthen declared his inability to comply with the terms then required for the first time, but would do so within ten days, if that time was allowed him, the plantation was *forthwith* offered for sale by the Sheriff, *by the directions of the defendant.* When the second sale took place, written notice was handed to the Sheriff by the plaintiff in execution, that specie, or the bills of specie-paying banks would be required in payment, which notice was drawn up in the *handwriting of the defendant.* At the second sale, as well as the first, *the defendant bid for the property.* When Flournoy who bid off the property at the second sale (who was known to the defendant to be in affluent circumstances, and prompt in meeting his pecuniary engagements) offered to comply with the terms of the sale within ten days, or a shorter time, and offered to give ample security for such payment, the Sheriff, *by the direction of the defendant,* or Virgil V. his brother, *at the instigation and prompting of the defendant,* declined the offer *immediately,* and offered the land for sale the third time.

When we take into consideration the public history of the pecuniary embarrassments of the country at the time of this sale, the suspension of the banks, and the great difficulty which existed in procuring specie, or the bills of specie-paying banks, it is extremely difficult for us to reconcile *the active interference of the defendant,* in forcing this valuable property to sale in the manner stated in the record, *with his duty as administrator,* or the interests of his *cestui que trusts,* whom he represented on that occa-

sion.   But we are not permitted to doubt *the motives* which prompted the active interference of the defendant, to impose *hard, onerous and unusual terms* in the sale of the " Mount Ariel " plantation, if the record speaks the truth.   The complainants charge, that notwithstanding Virgil V. Skrine, the plaintiff in execution, was the *nominal* purchaser of the property at the Sheriff's sale, yet in truth and in fact, it was purchased by him upon the *joint account,* and for the *mutual benefit* of himself and the *defendant,* and that this was done in pursuance of an understanding and agreement, entered into between them, *before the sale.*

The articles of agreement alleged to have been drawn up by the defendant, and submitted to his brother to be executed by him, are made an exhibit, for the purpose of sustaining that charge.

[3.]   But it is said, there is no *fraud* charged in the complainants' bill.   Fraud, in the sense of a Court of Equity, properly includes *all acts,* omissions and concealments, which involve a *breach of legal* or *equitable duty, trust, or confidence justly reposed,* and are *injurious* to another, or by which an undue and unconscientious advantage is taken of another.   1 *Story's Equity,* 197, §187.   The acts of the defendant in relation to the sale of the " Mount Ariel " plantation—the hard, onerous, and unusual terms imposed by his active co-operation with the plaintiff in execution, whereby the property was sold at an *undervalue* for the joint *benefit of himself* and the plaintiff, who became the *joint* purchasers thereof, to the *injury* of the distributees, constitutes, in our judgment, a breach of both *his legal and equitable duty as administrator,* in whom a *trust and confidence* had been reposed.   It is not necessary to allege the commission of a fraud, *in totidem verbis.*   If the bill states with distinctness and precision, *facts* and *circumstances,* which in themselves amount to a *fraud,* it is quite as unobjectionable, as if the very term itself was employed.   *Kennedy vs. Kennedy,* 2 *Ala. R.* 604.   *Story's Eq. P.* 211, §251.   Our conclusion then is, from the facts and circumstances apparent on the face of this record, that the " Mount Ariel " plantation was sold at an *under value ;* that the defendant *colluded* with the plaintiff in execution for his *individual benefit,* to

produce that result, and was *actively* engaged on the day of sale in furtherance of that object ; which facts and circumstances, are totally irreconcilable with his duty as administrator, and the trust and confidence reposed in him, for the protection of the rights and interests of the complainants ; that the facts, and circumstances charged and set forth by the complainants, constitute such a *fraud* upon their rights, by the defendant, as their *trustee*, in the sale of the property of the intestate, of which a Court of Equity will assume jurisdiction, and grant relief, notwithstanding the injury was inflicted, and the fraud perpetrated under *the forms of a judicial sale.* A Court of Equity will look into the whole transaction, consider the relative position and duties of the parties, and if it shall satisfactorily appear that the property of the defendant's intestate has been sold at an *under-value*, by his *collusion* and *active* interference to produce that result, he will not be permitted to shelter himself from a full discovery, under the *mere forms* of a judicial sale. A Court of Equity never will permit, in the exercise of its high, moral and appropriate functions, a party to make use of the *mere form* of a judicial sale as an *instrument*, by which the *cestui que trusts* of an executor or administrator, may be defrauded of their just rights, for the *personal pecuniary benefit* of such executor or administrator.

[4.] " *Fraud and damage* (says Chancellor *Kent*,) coupled together, will entitle the injured party to relief in any Court of justice." *Bacon vs. Bronson*, 7 *Johns. C. R.* 201. Justice to the rights of the complainants, as well as justice to the defendant requires, that the allegations relating to the sale of the " Mount Ariel " plantation, should be fully answered ; consequently, we affirm the judgment of the Court below, overruling the demurrer.